# EXHIBIT "G"

The following constitutes
the order of the court. Signed October 27, 2017



M. Elaine Hammond
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

In re

Richard and Julie Rivera,

Debtors.

Case No. 16-52851 MEH

Chapter 13

Date: August 30, 2017
Time: 9:00 a.m.
Ctrm: 3020

ORDER DENYING MOTION TO VALUE

Debtors Richard and Julie Rivera filed a Motion to Value Collateral and Avoid Creditor's Lien on December 12, 2016, seeking to avoid the lien of Secured Creditor Aspen G, LLC ("Creditor") on their home located at 140 College Road in Watsonville, California (the "Property"). (Dkt. #24). Creditor filed an opposition to the motion on December 22, 2016. (Dkt. #30). The court held an evidentiary hearing on the matter on August 30, 2017. Paul Seabrook and Vinod Nichani appeared on behalf of Debtors and Mark Oto appeared on behalf of Creditor.

This court has jurisdiction pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B) and (K). This order constitutes the findings of fact and conclusions of law of the court. Under 11 U.S.C. § 506(a),[1] a claim is not a secured claim to the extent that it exceeds the value of the property that secures it. *In re Zimmer*, 313 F.3d

---

[1] Unless specified otherwise, all chapter, code and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532, and the Federal Rules of Bankruptcy Procedure, Rules 1001–9037 (referred to herein as the "Bankruptcy Code").

1

1220, 1223 (9th Cir. 2002). Where a creditor's claim secured by Debtor's primary residence is determined to be entirely unsecured under § 506(a), the lien is void. *Id.*

In order to prevail, Debtors must show that the Property is worth less than the amount owed to the first deed of trust holder, JPMorgan Chase Bank. The amount owed by Debtors to JPMorgan Chase Bank is $427,110.21. Creditor contends that the Property is worth $470,000, while Debtors assert the value to be $250,000.

**The Property**

*Appraisals*

(1) Debtors' Appraisal

Both parties submitted appraisals. Debtors obtained an appraisal from Tom Melville, conducted on July 30, 2016, for $250,000. (Ex. 3). Melville based this value on a comparative market analysis of similar properties in the area. Melville testified that the Property is not marketable due to past flooding, termite, and mold issues, describing it is a 'fixer' property.

Comparable 1 is located 0.55 miles from the Property. Melville testified that he chose this property because it was a 'fixer' property and had sold recently. The testimony and report show that it was in a short sale in 2016 for $252,000, consequently, this property has not been exposed to the retail market and its history as a "REO" property casts doubt on its ability to help target the Property's value.

Comparable 2 was also chosen because it was a 'fixer' property and is located 1.01 miles from the Property. Melville testified that this property ultimately did not sell and that it was located in an age-restricted community. Comparable 3 is located .04 miles from the Property and sold for $450,000. Melville testified that he adjusted the value of the property by $50,000 because it is in better condition than the Property and is at a higher elevation, which means that it fares better in flooding.[2] Comparable 4 is 0.02 miles from the Property,

---

[2] It is unclear whether Comparable 3 is truly at a higher elevation than the Property, as it is next door.

2

Case: 16-52851   Doc# 62   Filed: 10/27/17   Entered: 10/27/17 13:10:17   Page 2 of 7
Case: 18-50604   Doc# 47-7   Filed: 08/02/18   Entered: 08/02/18 16:38:07   Page 3 of 8

and was pending sale at the time Melville conducted his appraisal. Melville also adjusted the value of this property by $50,000 due to its allegedly superior condition.

Debtor's appraisal gives the court pause. First, the comparables used are questionable. Comparable 1 was a short sale with no market exposure, Comparable 2 is located in an age-restricted community and was never sold,[3] and Comparable 3 was subjected to a downward adjustment of $51,600 with little explanation. In addition, Melville's testimony, that he rated the Property two condition levels lower than Comparable 4 because he saw water on the Property during his inspection, is contrary to pictures taken of the house at the time. The pictures show dry dirt beneath the house, indicating a lack of water. (Ex. 3, p. 16).

Further, the report fails to account for dual pane windows (Ex. 3, p. 1) in the Property and consistently fails to account for amenities in the comparable properties, such as fireplaces or furnaces. Melville also testified that he rated the quality of the construction of Comparable 3 as "Q3" but admitted that it actually warranted a "Q4" rating due to it being a ranch. It is unclear whether this admission would change his analysis. He also made a $50,000 adjustment to Comparable 3's value based on his rating of it as a "C3" property.[4] Melville offered little reasoning for this adjustment, or for any of the applied adjustments for other comparables. Although he cited to variables commonly used in these types of adjustments, he failed to point out the specific variables used to make adjustments in his appraisal. Melville even testified that the Property has a better kitchen than Comparable 3, contrary to his assertion that the Property is in worse condition than Comparable 3.

Neither Melville's report nor testimony adequately described the differences between the Property and the comparables.

(2) Creditor's Appraisal

Creditor obtained an appraisal from Eric Mould, who valued the Property at $470,000 effective October 3, 2016. (Ex. C). Mould's testimony and report indicate that he considered

---

[3] Melville testified that he had not adjusted the value based on this information nor noted it on the report. Melville also failed to note or adjust the property's value based on the fact that this property had a fireplace.
[4] A "C3" property is well-maintained and in better condition than a "C5" property, which was the rating of the Property in Debtor's appraisal.

3

Case: 16-52851    Doc# 62    Filed: 10/27/17    Entered: 10/27/17 13:10:17    Page 3 of 7
Case: 18-50604    Doc# 47-7    Filed: 08/02/18    Entered: 08/02/18 16:38:07    Page 4 of 8

the Property typical for the neighborhood and in generally average condition. As the Property is in a flood zone, Mould's report makes a $20,000 adjustment to each of the comparables not in a flood zone. As with Debtor's appraisal, Mould also includes Debtor's next-door neighbor as a comparable. However, he applied adjustments to increase the value of Debtor's Property by $20,000 based on dual pane windows and a less dated kitchen.

Overall, Creditor's appraisal applies incremental adjustments to individual property values with supporting explanations provided in the report and his live testimony. The comparables chosen are in the direct vicinity of the Property, and include detailed information about each comparable that Debtor's report fails to address.

Due to the large, unexplained adjustments in Debtor's appraisal, and the questionable nature of comparables, the court finds Creditor's appraisal more credible. Consequently, the value of the home, before adjustments for necessary repairs, is found to be $470,000.

***Repairs Needed***

Debtors contend that the property value should be reduced by the cost of necessary repairs. Creditor argues some reduction is appropriate but the applicable cost is significantly lower. Debtors obtained the quotes below for necessary repairs.

(1) Mold/Flooding

The parties concede that some type of mold has infested the Property, although the details of this infestation are unknown as no tests have been conducted to determine the mold type, and the court's analysis is limited by the lack of testing. The testimony and photographs provided indicate that the mold is primarily in the bedrooms and the bathroom.

Debtors received separate quotes to eradicate the mold. First, they received a quote from Coastwide Environmental Technologies, Inc. (Ex. 5). Coastwide gave an estimate to remove the interior drywall for $10,200, with an additional quote for removal of HVAC ducting for $3,400. Debtors also obtained a quote to then replace and install the drywall from Consolidated Drywall for $8,464. (Ex. 8). Debtor testified that she originally intended only

4

Case: 16-52851    Doc# 62    Filed: 10/27/17    Entered: 10/27/17 13:10:17    Page 4 of 7
Case: 18-50604    Doc# 47-7    Filed: 08/02/18    Entered: 08/02/18 16:38:07    Page 5 of 8

to replace the drywall covered in mold, but had ultimately received a quote to replace all the drywall. She also testified that the ducting contains debris caused by flooding.

For the Property's exterior, Debtors received a quote of $13,780 from Oliveira Plastering to replace stucco. (Ex. 7). Debtor testified that she did not know the effect of all of the proposed replacements listed under "Exterior" on that quote or whether the Property was already equipped with the products listed.

As no mold testing occurred, it is difficult to ascertain the necessary level of repair. Taken in the light most favorable to Debtors, the quotes for $10,200 from Coastwide, $8,464 from Consolidated Drywall, and $13,780 from Oliveira Plastering add up to $32,444 in repairs.

(2) Termites

Debtors also received an estimate from Terminix to remove and protect against termites on the Property. (Ex. 6). The Terminix report indicates that drywood termites were found and it recommends fumigation to eradicate them. (Ex. 6, p.7). Although Debtor testified that subterranean termites were also found, the report does not indicate this.

The Terminix report lays out five separate quotes for service plans, most of which are unnecessary based on the damage reported by Terminix. Debtor testified she did not know which services were necessary and relied on Terminix, but it appears to the court that the quotes seek to generate fees rather than address the identified problems. Only one plan appears relevant: the Tent Defend System for Drywood Termites.

As there is evidence of drywood termites on the Property, the Tent Defend System quote for $1,950 is deemed a necessary repair.

(3) Furnace

Debtor testified that the Property flooded post-petition during the previous winter. Although she testified that the current furnace is operational, Debtors received a quote from Freedom Heating for $6,503 to replace the furnace in the Property and install a new return air duct. (Ex. 9, p.1). A second quote from Freedom Heating also includes a new furnace, and incorporates moving the furnace's ducting from the garage into the house for a total of

5

$17,702. (Ex. 9, p. 2). There has been no evidence submitted to indicate that a new furnace is necessary. However, Debtor's testimony that dirt has infiltrated the ducting indicates that it is necessary to clean the ducting.[5] Creditor's repair estimate includes an estimate of $515 plus costs to clean and disinfect all of the ductwork. (Ex. E, p. 4). As this is the only submitted quote for cleaning the furnace's ducts, this amount shall apply as the cost for this repair.

(4) Plumbing

Finally, Debtors received a quote from Rosenthal Plumbing for a new copper water line. (Ex. 10). Previously, a pipe burst on the Property and Richard Rivera repaired it. Debtor testified that there is no leak on the property at this time. Thus, no further repair is required.

***Final Value***

The parties concede that some repair is necessary given the evidence. Taken in the light most favorable to Debtors, the estimate of this repair includes:

- $10,200 from Coastwide
- $8,464 from Consolidated Drywall
- $13,780 from Oliveira Plastering
- $1,950 from Terminix
- $750 from ML Clark Construction & Consulting[6]

This amount totals $35,144. Debtors have not established that the other repairs are necessary. Consequently, the costs of those repairs do not factor into this court's analysis and the value of the Property is found to be $434,856, in excess of the amount owed to JPMorgan Chase Bank. Debtor's motion to value is hereby DENIED.

**END OF ORDER**

---

[5] Other than Debtor's testimony that the ducting accumulates dirt after flooding, there is no evidence to support a finding that *removal* of the HVAC ducting is a necessary repair, per the additional quote submitted by Coastwide.

[6] This amount includes the cost to clean and disinfect the ductwork and costs and expenses added at the end of the quote submitted at Exhibit E.

6

Case: 16-52851    Doc# 62    Filed: 10/27/17    Entered: 10/27/17 13:10:17    Page 6 of 7
Case: 18-50604    Doc# 47-7    Filed: 08/02/18    Entered: 08/02/18 16:38:07    Page 7 of 8

**COURT SERVICE LIST**

**Via ECF:**

All ECF Recipients